Good afternoon, ladies and gentlemen. We are here for a re-hearing on Bonk in the consolidated cases of Peruta v. County of San Diego and Richards v. County of Yolo. Before we begin, I want to remind everyone to turn off their cell phones so we don't interrupt the attorneys who are presenting the case. You may proceed. Chief Judge Thomas, and may it please the court, Paul Clement for the appellate in the Peruta case, and I would like to endeavor to reserve three minutes for rebuttal if I could. This case involves a challenge to San Diego County's policy of interpreting good cause to require an applicant to demonstrate that they have a particularly acute need for self-defense, which distinguishes themselves from their ordinary fellow citizens. My client's complaint here is not with the California statutory scheme, because the statutory scheme itself can be interpreted to respect Second Amendment rights. Indeed, it has been so interpreted in the majority of California counties that allow good cause to be interpreted in a way that is much more permissive and allows people to get concealed carry permits for self-defense purposes. And that includes California counties like Sacramento County that are quite populous. Thus, the source of the constitutional difficulty here isn't with the statutory scheme, but it's with San Diego's interpretation of the good cause standard and San Diego's policy. Thus, striking down San Diego's policy would not invalidate any statute of the state of California, and to the contrary, doing so would save those statutes from constitutional doubt. Now, the question here I would also emphasize is not whether there is a constitutional right to concealed carry. Rather, the question is whether there is a constitutional right to some outlet to exercise the right to bear or carry arms for purposes of self-defense. The answer, as the Heller decision, I believe, makes abundantly clear, is yes, the government cannot completely foreclose an avenue for exercising an important Second Amendment right. Now, the government, in response to this, would try to suggest that the Second Amendment is somehow a homebound right, and thus does not extend to bearing arms or carrying arms outside the curtilage of the home, but only extends to keeping the arms in the home in the first instance. In terms of the procedural status of Peruta at this point, since the sheriff chose not to appeal, and now the state's going to be making an argument here and has asked to intervene, is Peruta a different vehicle now in terms of we have the surrounding cases, we have Prieto, and then we're holding an abeyance Baker? Can Peruta be decided the same without the sheriff here? Well, I think it can be decided the same. I mean, you know, I think that might depend ultimately on how the court resolves the state's motion to intervene. We actually don't have an issue with the state being here to intervene, to defend, to get involved in this case. We do take issue with them being here under the prong of Rule 24 that justifies them being here as of right because of a federal statute. We don't think that properly understood, our challenge calls into question the constitutionality of the California statutes for the reasons that I think I've already elaborated. We don't have a beef with those statutes. If my client was so fortunate as to live in Sacramento County, there would be no objection to what the state has done. So the objection really is to the county's policy and the way that the county interprets good cause. Do you think the recent denial of cert on the Jackson case out of California has any bearing on, since the Supreme Court doesn't really seem to like to talk about the Second Amendment very often, years go by without it. Can we read any tea leaves from that? Well, I suppose that might make this Court's decision all the more important. But other than that, I think all cert denials are worth about the same, which is in the cosmic scheme of things, not terribly much. It's very important, obviously, to the client in one particular case that their case is over, but I think we've been instructed time and time again not to read anything precedential into the simple denial of cert.  Mr. Clement, what can the sheriff require? Could he require a safety course completion, that kind of thing? Absolutely, Your Honor. And I think something like a safety course, frankly, would be much more tethered to the interest that's being asserted here by the county in safety. And we're not here to take issue with the idea of a licensing regime generally. As I said, we don't really have a beef with the way this same licensing scheme is administered by the majority of the counties in California, where they require a certificate of training, they require certainly other background checks and make sure that somebody is in a category where they are eligible to possess a firearm. But we don't think that whatever else could cause can be interpreted to mean, and maybe there's some case down the road as to whether a county can have a slightly more restrictive interpretation of good cause. But the one thing I don't think it can be is that you only get to show good cause if you show you have a better reason for the firearm than your fellow citizen when it comes to self-defense, when the Supreme Court in the Heller decision said that every citizen, the people, one of the key words in the Heller decision and its interpretation of the Constitution, the people have the right to possess a firearm for purposes of self-defense. So it seems a little antithetical to the basic thrust of the Heller decision to say that the only way that you can exercise your Second Amendment right is to show that you have a better basis for exercising that right than your fellow citizen. Well, Castle, you're unhappy with the comparative nature of it, but you've emphasized that self-defense is the touchstone. So can the county require someone to demonstrate that they require a firearm for self-defense, regardless of whether it's compared to anyone else's need for self-defense? I suppose that, you know, if a county wanted to take a position which says that we want you to, in order to satisfy good cause, articulate that self-defense is your good cause, and then essentially hum a few bars and articulate why it is that you feel you have a need for self-defense, I don't think that we would be here objecting to that, because as you say, you know, it's not just my client who's focused on self-defense. Obviously, the Supreme Court in the Heller decision was focused on self-defense, so we take that as our guide, and we think that certainly self-defense is something that can be, that can satisfy the good cause requirement. It may be that you need to explain the basis for your desire for self-defense, but I don't think it should be that the only way that you can do it is if you say, I have an acute need for self-defense that distinguishes me from my fellow citizens. But under your theory, any self-defense should be justifiable good cause? Well, no, I don't think so, because, I mean, you know, we take this case as it lies, and as it lies, the San Diego policy did not give my client any opportunity to say anything about self-defense beyond that it is a distinct right to self-defense compared to their citizens. So we weren't denied because our self-defense argument or articulation wasn't good enough in the abstract. We were denied because the county quite emphatically has a policy that requires the showing to be extraordinary vis-a-vis your fellow citizens. A premise for the three-judge panel decision was that a law-abiding citizen has the right to carry in public, whether openly or concealed, so that, as I read the three-judge panel, so long as you're not a convicted felon or insane or a child, that is to say you're a law-abiding adult citizen, you have a right to carry whether concealed or open. And then it followed from that, because California does not allow an unrestricted open carry, that the concealed carry had to be very sort of generous or permissive in terms of carrying. Do you share the premise of the three-judge panel? We think the premise of the three-judge panel's opinion is correct. Now, when I say premise, I mean your argument then stems from a premise that any law-abiding adult citizen has a right to carry, whether concealed or open, but one or the other, even any specific showing for desire for self-defense. I think they have a Second Amendment right. That doesn't necessarily follow from that that they would have an absolute entitlement to it, because the Second Amendment, like all constitutional principles, is not a principle without some limits. But I certainly think— So what limitations do you see? Well, I don't know that I see any particularly obvious ones in this context. But again, you know, my— No, that doesn't help me very much. You say you can limit the right to carry in public, but then you don't tell me what. Well, I mean, look, as a starting point, I think that it's fairly clear that, you know, states should have the option about how they regulate carry. So if one state wants to prefer open carry and another state wants to impose concealed carry, they certainly have that option. They may also have options in, you know, how they go about their licensing regimes, whether they require training courses, longer training courses, and the like. Now, I think with respect to restrictions that went beyond that, with all fairness to me and my client, I think we'd have to see what the policy is in order to kind of understand whether there's an argument that it conforms with the Second Amendment or not. Well, may I ask you then to go back historically to Robertson v. Baldwin, where the court basically said that the right of people to keep and bear arms is not infringed by laws that actually prohibit the carrying of concealed weapons. So that's not been abrogated by the Supreme Court, correct? I don't think they've ever had occasion to revisit that, but I don't really think—with all due respect, I don't think they abrogate their dictum all the time. So my question is, with that kind of fairly almost a black letter law statement, how does that case fit into your construct, and what would you have us do with that case? Well, what I would have you do with that case is to understand that dictum the way I would understand some of the other references, even in the Heller opinion itself, which is—and this was the point I was trying to make, which is we're not here saying we have an absolute constitutional right to concealed carry. And the way I would understand what the Robertson court meant by that dictum, which really was, I mean, super dictum, it's a 13th Amendment case, and they have a paragraph where they're making a drive-by statement about six different constitutional rights. So I think you have to keep that in context. But what I think they meant is on the assumption that there was open carry in that state, that a concealed carry restriction would be consistent with the Second Amendment. And I think that's the way that the Supreme Court in the Heller decision understood what was going on in a state like Georgia, in the Nunn case, where the court specifically confronted a statute that, as it was applied to firearms in particular, foreclosed both open and concealed carry. And in that context, both the Georgia court back in the 1820s or 1840s said, you have to essentially have a right to carry this one way or the other, otherwise you're jumping the tracks from the regulation of the Second Amendment right to the obliteration of the Second Amendment right. So that's how I'd understand the Robertson dictum in that same vein. Mr. Clement, if we assume for a moment that the Heller right applies in this context, why wouldn't it survive intermediate scrutiny? I'm glad you asked that, because, you know, look, there's a healthy debate here about intermediate versus strict scrutiny and all that, but I don't think San Diego's policy can survive any form of heightened scrutiny. And the reason I think that is because there are a couple of hallmarks of every form of heightened scrutiny, and they include, first of all, you relax the presumption that the ordinance or the statute is constitutional. Then you shift the burden to the government to defend the law rather than the ordinary rational basis, the burdens on my client to challenge it. And then you require actual evidence. And if you look at the evidence in this case, it is all of one declaration by Professor Zimmering, and this is at the excerpts of the record, I think 404 it starts at. And with all due respect, that cannot be enough to satisfy— Why not? It's an expert declaration. It's countered by the declarations that were put in by the plaintiffs. Right, but here's why I think it can't, because he doesn't even get to the relevant question. He really sort of makes two observations. One, less guns, less violence, and two, less concealed guns, less violence, but he doesn't ask what is really the critical question, which is if there are less concealed licensed guns, how does that affect the level of violence? That's the relevant question, and the county has no evidence on that and no excuse for not having the evidence. You know, this is a situation— Should the district court have conducted a trial? Is there a factual dispute here on this question? I don't think it's a factual dispute. What I think it is, is this case went to summary judgment. So the county had its opportunity to marshal all of its evidence. The burden's on it. At that point, it doesn't get a do-over, and it marshaled what it thought was sufficient evidence. With all due respect, we don't think they got the job done under intermediate scrutiny. And I think, just to finish with the thought I made before, you know, the Supreme Court, in a case like Turner Broadcasting, talked about predictive judgments, but that was in a context where there had to be a predictive judgment. The federal government had never imposed a must-carry requirement on cable operators before, so you had to make a guess. Here, the answer is sitting in plain sight in Sacramento County, in Fresno County, in San Bernardino County. There's no evidence in this record, and I don't think there's any evidence in the world, which is part of the reason why it's not in this record, that when those states adopted a more permissive interpretation of the good cause standard, that the sky fell, or that violence went up, or that crime went up. And when you have such an obvious comparator out there, and the state doesn't offer you that evidence, it seems to me that even if we're in intermediate scrutiny and not strict scrutiny, that doesn't get the job done. Now, what do we do with the Second Circuit's decision, the Second, Third, and Fourth? In Kalatsky, and Woollard, and what was the other one? I forget the other one, the Third Circuit. Yeah, Drake, I think it was the Third Circuit. There, the court said that very similar statutory provisions all survived intermediate scrutiny. Well, they did on their own. I mean, obviously, the most obvious thing, you know, those decisions aren't binding on this Court, and if we're going to start looking, ah, sure, but we could look to the Seventh Circuit, too, and I think Judge Posner had a fine opinion in the Moore case. But I think the real difference is all of those cases, if they were taking intermediate scrutiny seriously and doing it right, were based on the evidentiary records in those cases. And I think the situation in New York, for example, was radically different. There were a number of hearings before the New York legislature dealing with the particular provisions there, and there was a much richer record in that case that doesn't bear anything like the record in this case. And part of that is this oddity that, you know, if you think about the state's interest in this case, it's not even an interest in public safety, because they'd be perfectly happy for San Diego County to interpret this the same way as Sacramento County. So from the state level, the compelling interest here is giving discretion to county-level officials, and I don't think that's a good enough interest to satisfy intermediate scrutiny. And that's something that's true about this California regime that's not true about any other regime. But I thought you said, with respect to whether the evidence was available anywhere in the world, that there was no such evidence. How can you say, then, that there's such a rich record in New York that supports what they're doing? Well, I was really talking about the record, the evidence in California, because I think we have here a... And people behave differently in New York? No, what I don't think you have in other states, because other states answer this at the state level. So what you have in California that really distinguishes it from all these other states is the opportunity to have a very direct comparator about what would happen if we had a more permissive view of good cause compared to the policy that's being supported here. And they're obvious comparators. You look to Sacramento County, you look to Fresno County. But how long have those policies been in effect? Meaning you can't look at something that's been going on for six months and then draw legitimate conclusions. Well, I think each county is a little bit different, but I think some of these policies have been in effect for years. So I don't think it is... When I say the evidence isn't out there, I mean it's because, in fact, all the evidence that's been cited that I've seen in the record and the amicus briefs and all that that when jurisdictions adopt a policy of allowing relatively freer issuance of concealed permit carriers, one of two things happen. Either the crime rate stays exactly the same or it goes down. But I'm here to tell you that if you apply intermediate scrutiny and I'm wrong about this empirical question and another jurisdiction makes a better case, then that will be the consequence in that case. That's the great thing about intermediate scrutiny. It's not one size fits all and then we're done forever, and it admits of the possibility that cases will be decided differently based on the record in the particular case and the particular jurisdiction. And I really would invite you to take a look at that Zimring Declaration because I think that you will see that that... I mean, I can't think of another context, First Amendment, you name it, where that kind of declaration would be enough of an evidentiary basis for a jurisdiction that had the burden under even intermediate scrutiny as opposed to strict scrutiny. I'd like to... Thank you, counsel. Thank you. Chief Justice Thomas, and may it please the Court, Alan Gura for the Richards Appellants, and if I may reserve three minutes of time for rebuttal. Nobody argues in this case, and there's no evidence anywhere that would suggest, that people with a heightened need for self-defense are somehow by that virtue safer with firearms than are members of the community at large with only an ordinary garden variety need for self-defense. Rather, the argument here in this case by the defendants is that because carrying guns for self-defense is allegedly dangerous, they should be able to reduce that danger by reducing the number of people who are carrying handguns. Sheriff Prieto's policies are therefore nothing more or less than a rationing scheme for a fundamental right that the government believes is too dangerous to allow. I think the government... I'm sorry. Go ahead. Go ahead. Well, I think the government's going to argue that because there's certain exceptions of people that can have concealed weapons, that that somehow... So it isn't as harsh as it appears. What would be your response to that? I mean, I think there's certain military people, retired police officers. How does that factor... How would you respond to their argument? My response is this. If we have to defer to that balancing, to that judgment that the sheriff has made that some people with a certain background are okay to carry because the danger is somehow lessened, then the court would also have to defer in at least three other areas. Number one, the court would have to defer to the sheriff's judgment that nobody can acceptably exercise this right. If the sheriff says, well, today I've decided it's just so dangerous, no one can have it, that same deference would sustain that. The second problem would be why only apply it to the bare part of the Second Amendment? We heard the same arguments in the Heller case, that keeping handguns at home is unaccountably dangerous and for absolute needs of public safety, the District of Columbia should have been able to prohibit the possession of handguns in the home. Well, could Washington, D.C. enact a statute that said we're going to only allow people with an exceptionally strong fear of burglary or some extra heightened need perhaps that can show that somebody wants to burgle their house, only they can keep a handgun at home. There's nothing in the Second Amendment that would suggest that this type of heightened self-defense interest can apply to one side of the Second Amendment and not the other. And the third problem is if we're going to have this sort of deference or heightened need, why stop with the Second Amendment at all? After all, we can imagine that the Fourth Amendment is probably the right that the sheriff finds to be most annoying. It interferes greatly with the police power, that the sheriff can only exercise so much force, he might need to get a warrant sometime. Why not only respect the Fourth Amendment rights if people have a heightened need for privacy or a more sensitive... But that is an area in which danger plays a role because the doctrine of exigent circumstances comes into play when danger is apparent and immediate. If taken to its extreme, your argument seems to suggest that safety concerns are irrelevant and that no sort of restriction is okay. Is there any form of restriction that you would find, in your view, constitutionally permissible? Yes, Your Honor. And it's not our argument that no restrictions can be tolerated. Rather, this is a very narrow challenge. The only restriction we're challenging here is on the very entitlement, as it were, to exercise a fundamental right. There is no challenge in this case to any restriction that the sheriff might place on time, place, or manner, if he wants to enact that. There are no sensitive place restrictions here at all. There's no challenge to the training requirement. We accept that. And we could probably imagine other types of regulations that would pass some level of means and scrutiny precisely because they are addressed to an actual danger rather than a regulation like this one, which is based on the theory that the right itself can't be tolerated because the sheriff disagrees with the right. So it's not like the Fourth Amendment situation where there might be an exigent circumstance and the sheriff can say, you know, we have a fleeing felon, we have the evidence being destroyed, we have a kidnapping of a ticking time bomb. We can imagine all those exigent circumstances. But wouldn't it be much simpler for the sheriff to say, as he does in this case, generally speaking, overall, this idea that people should have a right to demand a reasonable search, whatever that might mean, that simply has too high a burden on public safety, and so I'm only going to be concerned with the rights of people who I believe have a special need for those rights. That would not fly in this courtroom. It doesn't fly in speech cases. We know it doesn't work in abortion cases because this court decided Isaacson v. Horn. What was Isaacson v. Horn about? The state of Arizona decided that in its police power, and it has the power to regulate medical decisions unquestionably, it determined that a fetus can feel pain at 20 weeks and therefore it balanced the ability to access abortion services at that time on a need of medical necessity, and this court very properly said, no, regardless of what one might think about abortion, the fact is that the right is recognized within this time frame and therefore it's the woman's right to choose whether to have the procedure, not the doctor's right to determine that it's medically necessary. Since this case has started, there's been a change in circumstances as to the law for open carry in California. Is your suit premised on the change in the law, or is it premised on the law as you found it when your client was not allowed the concealed permit? The law may have changed, but our theory has not. Well, but just a minute, just a minute. It seems to me that if I am to apply the law that existed as to the carry, open carry that existed at the time when your client was not given this concealed permit, at that point your client could have open carried, if you will, an unarmed weapon and also could have carried some ammunition to put in the weapon. Now it is that he can't carry either. Does your case live or die on that change? No, it does not. If anything, our case has become stronger. But at the time, why is it stronger? The law didn't change for your client, and I'm just trying to say can I apply the facts as they were at the time your client was denied his permit? Are you suggesting I have to change the theory and apply the change in the law? And if so, why not go ask the district court again whether you're really right or not? I mean, I'm just trying to test you. Sure. The district court's opinion didn't really turn on that availability. I believe it did. Oh, I think it did. I mean, if I look at what the district court did, I look at pages 8 and 9, as he relates to what it would be that would be available in this particular situation. That would be not in your client's opinion, but that would have been in Mr. Peruta's opinion. And page 10 of your opinion, of the Richards' opinion, seems to be based on what the basis of the law was on carry. The basis of the Second Amendment at the time we filed the complaint is unchanged, and that is that people have the right to be armed and ready in case of confrontation. Now, just a minute. But if I am going to apply an intermediate scrutiny to this particular matter, and the law does not say anything about the fact that you're allowed to carry whatever you want unloaded and with ammunition, doesn't it seem that that's a pretty big basis to suggest that on intermediate scrutiny the law survives? No, Your Honor. The fact is that, first of all, let's take the law as it was at the beginning. The ability to carry an unloaded gun is quite useless, in fact. It's not dangerous. I don't know whether it's quite useless or dangerous because we had a similar case in Jackson where our court held that having guns in the closet and ammunition there was equal to anything that was needed. And the Supreme Court did not take any chance to undo that. Your Honor, nowhere in America, never in American history or tradition, have people carried unloaded guns for self-defense. That's simply not part of the tradition. Why is that in the record? I mean, that may be your great argument, but I didn't find that in the record in any place. Your Honor, the Second Amendment states, as the Supreme Court has told us, that people have the right to carry- The Second Amendment talks about the right to self-defense. And all we're talking about now is the difference between self-defense in the loaded or unloaded with ammunition. Your Honor, neither now or then did my clients have the ability to carry a functional firearm for self-defense. Right now, today, they certainly can't because- What do you mean by functional? A gun that is not disassembled, a gun that is actually loaded and ready to be used. Okay, but loaded and functional are two different things. So do you mean functional or do you mean loaded? Well, I guess loaded is a lesser included aspect of functional. We were talking about functional, functional guns. In fact, we had this issue in Heller where people were not allowed to render their arms functional. They had to be disassembled or locked up and unloaded. And the Supreme Court said this violates the Second Amendment because there was no exception. As in Jackson, there was an exception. This was simply a violation of the Second Amendment because there was no way that people could use their guns in self-defense. But I would also like to respond to the question that Mr. Clement also received earlier about Robertson v. Baldwin because I think the answer here is contained in Heller. And we have to look at how Heller defines the Second Amendment, and I think this is critical. Heller tells us that to bear arms, as it's used in the Second Amendment, is to wear, bear, or carry upon the person or in the clothing or in a pocket for the purpose of being armed and ready. Well, those are two separate categories of carrying. Upon the person, we can imagine as open carrying, or in the clothing or in a pocket. That sounds like concealment. And so Heller recognized in its definition of the term bear arms that concealed carry can, in fact, be one way of exercising that right. And then, of course, as my colleague ably argued earlier, the Heller opinion made quite clear, as did many opinions earlier in American history, that the state can regulate the manner in which guns are carried. And because the state can regulate the manner in which they are carried, the state can tell people, you may not open carry, you may not conceal carry. And we don't have a claim that we are entitled to carry in any particular manner. My clients will take what they're given by the legislature. But if the legislature says, you can't carry in any way, shape, or form, we're not going to allow open carrying. And for concealed carry, we're going to give you a license to which you're simply not entitled to because we don't recognize self-defense, a generalized interest in self-defense as a reason for the license. Then the right has been effectively destroyed. Let me ask you, your colleague referred to the Seventh Circuit opinion. But, of course, the Seventh Circuit opinion was looking at a flat ban, correct? Correct. And in that opinion, the court actually contrasts the flat ban, which was an Illinois situation, with a situation, for example, in New York. And New York had, it seems to me, the good cause provision that's very similar to Yolo County and to San Diego County. So maybe you can enlighten me on why you think that Moore v. Madigan out of the Seventh Circuit somehow lends credence to your argument and why these other circuits, why we shouldn't be looking to them for what has been held to be constitutional in terms of good cause. The New York law would not survive under Moore v. Madigan, and perhaps the Illinois legislature recognized that when they enacted their legislative response and created a shall issue system. The Moore opinion goes on at length to discuss how it is that the Chicagoans have the same right to have a gun for self-defense on the street as much as they do up in their apartments. The Moore opinion goes on and on at great length. But that's a flat ban. We don't have a flat ban, which you said, of course, you would oppose. But we don't have that. We have a ban with a proviso hanging off of it. But Moore made clear that the same self-defense interest that secures the right to keep arms in the home is the same self-defense interest that underlies the right to bear arms outside the home. And I don't believe that Moore suggested, and no court really has suggested, that this type of good cause scheme would be applicable to the right exercised within the home. Right. And I'm meaning to exclude the home because we're talking about outside the home at this point. If the self-defense interest is the same, if the constitutional interest that belongs to the people generally is the same inside as well as outside, then there's no way that a law like this, which starts from the presumption that the population at large is disabled from exercising a fundamental right, could survive. If I may reserve my time for rebuttal. Thank you, counsel. Thank you, Your Honor. May it please the court. Edward Dumont for the State of California. I'm here with James Chapin for San Diego County and Sheriff Gore, and John Whitesides for Yolo County and Sheriff Prieto. I'm authorized to confirm that Sheriff Gore, as he previously advised the court, has not changed his policies or procedures for the issuance of concealed weapons permits, pending further guidance from the court. Beyond that, Mr. Chapin is here to answer any questions for San Diego or Sheriff Gore. Otherwise, San Diego has graciously ceded its argument time to the state, and I will be dividing the time with Mr. Whitesides. So, Mr. Dumont, where were you when we argued this case before? The sheriff now isn't going ahead, and we questioned at that particular time. We said, does the state know about that? Oh, yes, they know about that. And, you know, we had all the discussions about whether, you know, it implicated a statutory scheme, and then the state just sat on its hands and then lost, and here you are. And so suddenly, you know, why should we let you intervene at this point? Well, first of all, we appreciate the ability to be here today. We would have liked to have heard from you before. Whether we're permitted to intervene or not, and we appreciate that indulgence from the court. We do think we should be permitted to intervene, given the way that this case or these cases together have now become, in a sense, or in essence, a challenge to the constitutionality of the California public hearing scheme as a whole. Now, there are ways that the court can and I think should resolve the cases that would not have those implications, but we are here because when, because two things happen. One, the panel opinion addressed the issues in a way that has very broad significance, potentially for California law and California's ability to regulate. And number two, Sheriff Gore decided at that time not to seek a hearing on Bonk, and therefore we made the decision to ask the court, the full court, to take a second look. And we're very grateful for that. Well, now, if we allow you to intervene, what does that mean for intervention in general? Because, obviously, my understanding of the governor and the attorney general's office, they're supposed to defend laws that they think are constitutional. And, you know, no one seems to want to weigh in on these political issues, as it were. And then, you know, now, little, isn't it, why isn't it too late? With respect, when these cases. If there were another case, there would be no way parties would be able to intervene after they've, when they've known about it and they had a clear, it was clearly implicated. I agree the circumstances here are unusual and rare, and we would not anticipate doing this on a regular basis because this is an important case. Mr. DuMont, when I was a district judge, there was some, and we used to get cases like this, there was some obligation on the district court to certify to the state or to the attorney general of the United States that either a federal or state statute had been called into question. Did the district court make that certification to the state attorney general's office? I don't believe the formal certifications were made. That said, I wouldn't want to rely on that because we were aware of the case. We knew about the case. What I wanted to say was that, you know, both of these cases, as they were presented in the complaints in the district courts, presented a couple of different avenues. And one of them could have been a very broad view, but more particularly they seemed to be focused on the individual exercises of discretion by the sheriffs in these two counties, including allegations that the decisions were being made in an arbitrary way or based on favoritism. Those were not issues that we thought the state had a compelling reason to get involved in the cases for. Now, as it turns out, the case has been decided on much broader legal grounds, and that is why we are here. Is there a way that the good cause requirement could be interpreted to avoid any kind of challenge to the state statute? I mean, the local interpretation. As I understand from Mr. Clement, he says we're only challenging the interpretation of good cause by the sheriff. Right? I heard him say that. Now, is there a way that you could interpret the statute to essentially avoid the problem that we have here? Well, I take it that my friends would be content with an interpretation that said that good cause is satisfied by an assertion by any individual, any law-abiding individual of a need or desire to carry on self-defense. That is not the interpretation that we have put on, or that we believe that individual sheriffs may put on. And it's possible, Mr. Clement offered, that there might be some intermediate ground where a sheriff could make a discretionary decision, but I wasn't quite clear what the grounds would be that would be greater than, well, I would like to carry for self-defense, but shorter. How does the state define good cause in this context? The state leaves this, the state law leaves this up to the individual sheriff. So the state of California has no view? The state of California, the state statutory structure is to commit the discretion to define good cause and give the responsibility to define good cause to local sheriffs because conditions may vary from place to place, and a local sheriff is locally accountable and aware of local conditions. And it may be that the policy that makes sense is different in Yolo County or San Diego County from Shasta County or Lassen County. That's the fundamental structure, so we don't believe that there is a, there may be a baseline past which you couldn't go, but there's not a one statewide definition of good cause. The Second Amendment doesn't change county to county, right? That's correct, and we are here to defend the ability, the constitutionality of a sheriff imposing the kind of standard that Sheriff Gorin, Sheriff Prieto have imposed, which is also the kind of standard that New York imposed under its statute, and that's been upheld, as you said, in the Second, Third, and Fourth Circuits. So is it the county's view that the Heller right doesn't apply? I mean, is it the state's view that the Heller right doesn't apply in this context? I want to be careful how I answer that. It's not our view that the Second Amendment has no purchase anywhere outside the home, but what my friends on the other side like to do is to define the right recognized in Heller as a right to do exactly what they want to do, which is carry concealed weapons on the streets and public spaces in the streets and parks and public squares of San Diego or Davis. And that we do not think Heller stands for. And let me give you a few reasons for that. First of all, it's history and tradition, right? Heller leaves many things unclear. But one thing that it makes, I think, passably clear is that restrictions on concealed carry of lethal weapons, especially in cities and towns, have a long and rich tradition and do not conflict with the basic Second Amendment right. Pardon me. I just took a note here. I want to get you right. It is the state's position that the Heller right can apply outside the home. The core right of a law abiding and responsible citizen to use a firearm for self-defense can apply outside the home. Yes or no. Yes. With a qualification, which is that we think there is the Supreme Court has not addressed this. The Supreme Court has not given us any guidance about outside the home. I think it is candidly hard to read Heller and come away with the thought that there is no purchase for the Second Amendment outside the home. But I think it is very easy to read Heller, in fact, necessary to read Heller, to say that the Second Amendment does not confer a right to the concealed carry of handguns, especially in cities and towns. Suppose the concealed carry prohibition is supplemented by an open carry prohibition so that it equals a total prohibition. Right. What's your position on that? The position on that is twofold. First, I think there is a lot of historical evidence that in the context of public spaces in cities and towns, which is what we are talking about here, there is also a long and rich tradition of public regulation of the ability to carry dangerous weapons, including handguns. And we think that that history has been elaborated some in Heller and McDonald, but also in Kachowski, for instance, in Judge Williams' opinion, and more in the opinion of Drake. In fact, Drake relies in part on this for its alternative holding. And so in part, we would say there is a very good argument that categorically we are allowed to regulate open carry, along with concealed carry, when we are talking about the public spaces of cities and towns. Now, Justice Scalia said that none versus state was a perfect embodiment of a concept, and also the Louisiana case, I think it was Chandler. Both of those were open carry situations in public spaces, were they not? Those were, I don't know exactly where the defendant was arrested in none versus state. My recollection of the case is that the statutes applied statewide, without a distinction between rural areas and cities and towns. And what the court held in none was, yes, you can ban concealed carry, which of course would be enough here, but you can't ban it if you also ban open carry. Now, the Everytown for Gun Safety brief, which has been filed recently in this court, goes through a very interesting historical analysis of whether the South was representative of the rest of the country and how much we should infer from what the rule was in the South. But my point is not to establish here. I don't know that the record allows us to establish categorically that we could ban both open and concealed carry. But I do think that there is a rich tradition of regulation, and what California is doing here is regulation. It's not a ban. So, for instance, in unincorporated areas, outside cities and towns, except for prohibited areas where you're not allowed to discharge a weapon, you are free to carry open and loaded. At your business, your place of business, even in San Diego, you are allowed to take your gun there and to keep it there and to carry it there. If you find yourself in an emergency and your gun is nearby, you are allowed to load it and have it for the duration of that emergency. That one was curious for me, because if you kill someone in self-defense, the DA's office determines that it was a justifiable homicide. But without that exception, then you would get charged with having a loaded gun in a public place? I wasn't really sure what that exception amounted to. It amounts to a statutory exemption from what might otherwise be prohibitions in narrow circumstances where you are faced with a life-threatening situation and public aid is not immediately available. And I think it's significant. But also, other ordinary activities for firearms ownership outside the home, purchase, training, sports use, camping, hunting, all of these are accommodated by California's scheme. And so the fact that you can't get a concealed weapons permit to allow you to walk on the streets and in the parks and in the malls and the parking lots of downtown San Diego or downtown Davis does not mean that your right to carry a firearm outside the home has been destroyed. Does this argument assume the change in law that now there is absolutely no carry that is not concealed, whereas prior to this change one could carry but one could not carry it loaded? Does your argument apply to both situations or are we only dealing with the situation which befronted these plaintiffs? I've been arguing in terms of the current law, which I believe is harder for the state because the law now imposes greater restrictions on unloaded open carry. Is that in front of us? I didn't find, frankly, in any of the facts situation where that was the case which befronted the plaintiffs who bring the suit. I agree that at the time that these plaintiffs sought their permits and the permits were denied, that was not the law, and I suppose one could evaluate the decision to deny on that basis. Given the reasons the state is here, we have not approached the case on that basis. We have taken the view that we should defend the statutory structure on the basis of the statutes as they are now. Mr. Dumont, I asked Mr. Clement about intermediate scrutiny and the record in this case. How do you respond to his argument here that the declaration by Professor Zimring, I think the county submitted Professor Zimring's affidavit? That's correct. And Mr. Clement said, well, it's not really worth much. The affidavit has in it, in the voice of an expert who is a longstanding and very experienced professor, a variety of statements which do support points that I wanted to get to in a moment about the degree of danger that concealed or open carry, personal carry in public spaces impose. If the court feels that the record, and I do think you have to understand that the record here was built at a time when, first of all, the law was very different as to unloaded open carry. Well, that's the main difference. And I don't think it would be appropriate to resolve this case, at least on any broad basis, on the basis of that record. So if the court feels that the record here is not sufficient to support the state's and the county's positions in the way that the case has developed, then I would suggest that the right thing to do is reverse the summary judgment in favor of the county's and remand it for the development of a greater record. That said, I don't think... Counsel suggested that if the evidence isn't sufficient in the affidavits that we have well in front of us, that at that point we should, as I understood his argument, grant him summary judgment. I believe that's his argument. I understand why he would take that position. I don't think that's the right answer in terms of... Why? That's the question. Well, for two reasons. I'm not sure it would be the right answer under any circumstances, but in these circumstances where what is now at least at issue is an issue of very broad significance, if the court's going to issue a ruling of broad significance, then you should do so either by taking judicial notice of the same sorts of facts that have been recited in the opinions of other courts. I will say I think most of this, about the risk that's posed by these weapons in public places, is a matter of common sense and could be subject to judicial notice. But if the court's going to issue a broad ruling, it should be done on the basis of a good record. If the court wants to resolve the case in a very narrow way that applies, for example, only to these plaintiffs and gives them their permits, but perhaps leaves the sheriff free to build a different record in a different case, I suppose that choice would be open to the court. Your time has expired. Thank you, counsel. Good afternoon. Chief Judge Thomas, may it please the court, John Whitesides for the County of Yolo and Sheriff Ed Prieto. I'd like to begin by addressing Judge Smith's questions about the change in law. The law changed after the opening and answering briefs were filed. Mr. Gura referred to it in his reply brief as cementing a victory for plaintiffs. At the panel level, we were asked, I believe by Chief Judge Thomas, whether or not that would prevent the case from going forward. And counsel agreed that it would not in both cases, both in Peruta and in Richards. And in Richards, the reason why I took that position was because as I read the district court's opinion, the changes that had been made in the law, and I will address those in a minute, would not have changed the district court's view. But I did find in the Peruta opinion and page 10 of the Richards opinion, where it seems to be that both district courts put a lot of emphasis on the present carry policy or carry law of California and suggested then that that was maybe some reason why intermediate scrutiny would not strike down the law, because they had carry provisions which were allowed then, simply you couldn't put the ammunition with the gun. Because those exceptions still exist, albeit in lesser form. Yes, they still exist. So the way the current scheme works, it's different than the old scheme. In the old scheme and in the current scheme, you could carry loaded on private property, business or residential with permission as long as it was in a public place. When you got to a public place, so let's say a grocery store or a restaurant, as opposed to your lawyer's office or your accountant's office, under the new law, if you get permission from that property owner or the tenant, party entitled to possession, to carry, you can only do it unloaded. You can still carry, but it has to be unloaded. Under the old law, you could carry loaded with permission. The other significant change is that under the old law, you could carry unloaded on you. So for example, on a holster, open, displayed, not concealed, as long as it was unloaded when you were going down a public street. You can't do that now. Now it has to be in a locked container. So those are the two differences. In my view, those two differences... As I understand the law is now, you can't carry openly anything. What you have to do is get the concealed permit. And if you don't get the concealed permit, you can't carry at all. That's only for walking up and down the public street within a city limit. I understand. And that's what I understand the sheriff is putting his regulations to. That's true, but you have to remember that Yolo County is 95% rural. And so when we're talking about whether there's a substantial burden on a fundamental right, and even if we assume that historically the right to carry a loaded firearm in public was generally observed, which we would submit is not the case, but even if you assumed it was, it's not a substantial burden if your inability to carry is limited to less than 1% of the county. I mean, if you can go to your relatives, you can go to your friends, you can go to your neighbors, if you can go to your lawyers, to your accountants, if you can go to your place of business and do all those things loaded, and then when you get to the grocery store or the bank and we'll entertain the fiction that those places would allow you to carry a gun regardless of what state law is, but let's suppose the bank says, sure, you can come in with your gun. All that's left are the streets. And people don't walk up and down the street just to walk up and down the street. They walk up and down the street to go in and out of businesses. So this theoretical burden on their right to carry is only going to be impacted if the business that they're going to would let them in the door with the gun in the first place. So, to me, this burden that's being argued for... I don't understand that because people walk up and down the streets for a lot of reasons. And you don't have to be going somewhere to walk up and down the street. You don't have to be, true. I mean, if you're worried about self-defense, you can stroll around in the late evening, you can, you know, circumvent a park, you can do all kinds of things, but under your theory, that's okay because if you were in the country, there's no restriction. What I'm saying is, yes, it's a restriction, but viewed in the totality of where you can carry, it's a small restriction. It's not a substantial burden. If you can go 99% of the places you want to go and carry, the fact that you can't go to 1% shouldn't be deemed constitutionally problematic. Do you take the position, then, that you start with the premise that Heller extends beyond the home, gives you that constitutional right outside the home, but then you're only narrowing it, and as you put it, 1%, or a very small handful of circumstances? Is that the construct, or do you not agree with that? I do, adding one layer. And the layer I would add is that extending beyond the home and extending to carry in a public area of a city are not the same thing. And we've got extensive scholarly expositions by several of the amicus, including the League of California Cities and Every Town Against Gun Violence that track the historical progression of restrictions on carry in urban areas all the way from colonial through antebellum post-ratification forward. But I guess what's unusual about your argument, I'm hearing you concede that Heller does not restrict self-defense to the home. Correct. All right. So everyone seems to be in agreement on that. But then you seem to be arguing that while yours is not very restrictive, it's because you're in a rural area, and the really danger is in the cities that are very heavily populated, that that seems to be the danger, but you're saying you're a rural area. So what's the government interest, and why is this so dangerous where you are? Well, I'm not saying it's just because it's a rural area. I heard you say in a rural area it isn't as dangerous. I didn't say that. I did not say it's not as dangerous. I didn't say anything about degree of danger one way or the other. Okay. So you're not saying that. No. Okay. No. The argument I'm making has nothing to do with what places are more dangerous than others. Where the individual chooses to go is my point. In other words, it's not a substantial burden if you can choose to go to most places and still have some right to carry. Was this all on the record? Yes. It's in the underlying briefing, and of course, again, the law changed in the ways I just described. But, you know, I mean, Heller talks about sensitive places, this courthouse being one of them. So, you know, it already expresses the idea that at least when you're outside your house, there's going to be more restriction tolerated than there is when you're inside the house. And it's, you know, interesting because we talked briefly about the Moore case, and in the subsequent opinion, the one that came out after the Illinois law was found unconstitutional and then the parties go back because the Illinois legislature is not acting quickly enough to suit the plaintiffs. And in the subsequent opinion that comes out, which is 734F3rd748, Judge Posner says, quote, we say only that our mandate did not forbid the state to impose greater restrictions on carrying a gun outside the home than Illinois law imposes on possessing a gun in the home. So even Moore acknowledges that once you're outside the home, the state can regulate more extensively, and we think that's in keeping with the historical precedent that existed from the Constitution's founding all the way through ratification until now. So is it rational basis, intermediate scrutiny, or strict scrutiny? If there's no fundamental right to carry concealed in a public place, then it would be rational basis because there's no burden on a fundamental constitutional right. And we think that the other circuits stand for that proposition, and I'd throw in the first as well in Hightower, which we briefed in one of our supplemental briefings. That court said, and that's at 653F3rd61, that the refusal to issue a concealed carry permit to a retired policeman did not burden a core Second Amendment right because that doesn't exist for concealed carry. So in this case, we have several layers. We have concealed, and the plaintiffs fairly concede, well, that's not a true constitutional right. Mr. Gurr referred to the language in Heller about in the pocket or the clothing, but that language is defining the word carry. It's not defining the scope of the constitutional right that's in the Second Amendment. That's just a physical description of what does it mean to carry, and that means something more than just to possess, you know, to bear, meaning that you're going somewhere. And we feel that the Second Amendment has always been treated as more extensive outside the home. I mean, look at hunting. I mean, that's a core Second Amendment right, isn't it? I mean, Heller tells us that. Colonially, you had to keep yourself alive by eating just as much as you did by defending yourself. Is there anything that's more restricted in modern American cities than the right to hunt? Probably smoking. LAUGHTER There you go. So, sure, I mean, it is allowed occasionally, and there's some cities where there's a deer problem because there's no natural predators and you can get a special license to hunt deer in the city limits, but generally, I can't do that. I can't go out here and say, oh, boy, that's a big, fat pigeon and shoot it. It's not allowed, and that's not controversial. And so what, you know, California's doing here is it's a spectrum. It's allowing, you know, putting aside local ordinances, but as a state, it's allowing full rights inside the home and pretty much equal on other private property, friends, neighbours, relatives, pretty much equal on private businesses. Then when you get to where people are congregating, the shopping malls, the restaurants, the department stores, then the regulation gets tighter. Then it's open carry, but it has to be unloaded. And then finally you get to the city streets where we get at its most restrictive. But we don't feel in any way that that could be deemed a destruction of a fundamental right because it's not a fundamental right historically, and there's no destruction. Again, at most there's a burden, not a substantial one, but, yes, there's a burden, far less of a burden than there is on hunting or smoking. In Richards, which is your case, what was the evidence presented that would suggest that the law that was enacted substantially relates to the interest that the city or county determines they have? The only evidence was a declaration from the undersheriff that basically gave the sheriffs reasons as to why they were concerned about issuing a carry permit to anyone who just put down self-defense. That's what I thought. So if in fact the declaration of the undersheriff is not sufficient to apply the substantial interest of the county, then what at that point do I do? Well, unless you found that there's a fundamental burden on a, or excuse me, a substantial burden on a fundamental constitutional right, it wouldn't be a problem. Even if, supposing that I once get to the fact that I have to apply intermediate scrutiny, and I now get to the idea that at that point, applying intermediate scrutiny, there's a government interest, but I can't find any way where the government interest was related to what you did. Well, I think his declaration relates it. If a declaration doesn't, then what should I do? Well, both sides move for summary judgment, so if you found that neither side had sufficient evidence to warrant summary judgment, then you would have to send it back. Was there any evidence from the plaintiffs in your particular case? No. Was there any declaration? There were declarations that described the process that they went through, but nothing about a particularized need, as Mr. Gura said. That wasn't their argument. Their argument wasn't that they had a special need. Their argument was that I desire self-defense and I am not otherwise disqualified by virtue of criminal record or lack of training, et cetera. All right. Thank you, Kelly. Thank you, counsel. Thank you. Mr. Clement, we'll give you three minutes. Thank you, Your Honor. I have three minutes. I think I have three points. The first, I think, is the most important, because if I heard the other side correctly, they essentially concede that the Second Amendment applies outside the home, and they either conceded or came perilously close to conceding that a ban on both open carry and concealed carry would be unconstitutional. So then the question that becomes very important is the scope of open carry under California law. And Mr. Dumont gave you an accurate half the story, but I want to tell you the other half of the story, which is under the new law you have open carry prohibited in the cities, which is what they want to talk about, but then he also told you that it's prohibited in the prohibited areas of the unincorporated parts of the county. Now, that means that the key word is prohibited areas, and that's defined in the California Penal Code at 17030 to basically mean anywhere you can't discharge a firearm. And the problem is that's almost everywhere. That's the streets, that's anywhere near a dwelling or an unoccupied dwelling or a car or an unoccupied car. So please don't decide this case on the presumption that you can carry openly in 85% of a county that's unincorporated, because you can't carry openly in the prohibited areas in the unincorporated areas, and that's almost anywhere you'd ever get. If you are on the grid, if you are on the streets, if you are near a dwelling, if you are near a car, you cannot carry openly. And that's why this is a situation where we're not asking for a constitutional right to concealed carry. We are asking for a constitutional right to have some mechanism to exercise what my friends essentially concede we have, which is a right to self-defense outside the home, and that is really being forbidden to us almost anywhere that we could get on the grid. The second point is to try to be responsive to why the Moore case is significant. It's actually less significant than I thought it would be, because it's most significant on the point that the other side has conceded, which as Judge Posner, I think, emphatically explains why it is that the Second Amendment extends outside the home. And some of the other circuits decided their case either on the assumption that it doesn't or were sort of dubatante on that question. So I think Moore's principal significance is that the constitutional right to carry does extend outside the home. Now, if you think about the cases that are out there, sure, there are the Second, the Third, and the Fourth Circuit cases. There's the Seventh Circuit case, and I will grant you that it's somewhat different. But California isn't just like New York. It's not just like New Jersey. It does have... Thankfully. No, but I mean not just generally, but as to the statute. And what makes it so different, I think, is that it leaves it up to the counties. And so unlike the states where they make this decision on a statewide basis and assemble a statewide case for why this is so important to public safety, California doesn't, with all due respect, really care that much. They'll leave it up to Sacramento County, and it's perfectly constitutional. So the record then becomes what the record is in each case, and the record here is not enough to satisfy strict scrutiny or intermediate scrutiny. Thank you. Thank you, counsel. We'll put three minutes on the clock, gentlemen. Thanks. Thank you, Your Honors. I'd like to make three or four points in the limited time I have here. First of all, both the counsel on the other side alluded to the Everytown Brief and other arguments that there is a historical basis for this type of law. The Everytown Brief does a fantastic job of marshalling evidence for the proposition that the right to carry guns has been regulated. But there really is no historical basis for this type of law. It dates back earlier than, as the Drake Court found, the early part of the 20th century when New York and New Jersey enacted those particular types of regulations. Now, what else was going on in the early part of the 20th century? Well, those were the days of kruokshank, right? The last word from the Supreme Court at that time was that the Second Amendment did not apply to the states. And so it cannot be that we look to the legislative behavior of legislatures at that time as evidence as to how people understood the Second Amendment right to exist because if those legislatures had consulted the Supreme Court's guidance on the Second Amendment, they would be told that they were completely exempt from having to be concerned about it. Of course, they have in other cases as well. It's interesting, counsel noted the Hightower case. And we filed the 20HA letter on November 26th that responded to their citation of Hightower. And in there we noted two things. First of all, Hightower distinguished the claim that the plaintiff made there because the court found that the plaintiff had the ability to obtain a license to carry a handgun openly, a so-called Class B open carry license in Massachusetts. Obviously, that's not on the cards today. But in response to that, we also noted a couple of other court decisions which perhaps merit some discussion. First of all, we have People v. DeRio, 189 Northwest 927, where the Michigan Supreme Court held, and I quote here, the exercise of a right guaranteed by the Constitution cannot be made subject to the will of the sheriff. And there they were talking about the right to have a handgun. More recently in Schubert v. DeBard from the Indiana Court of Appeals, essentially this case, 398 Northeast 2nd, 1339, we had a police chief who decided that he had the ability to evaluate people's claims of self-defense as a reason for granting or denying a permit to carry a concealed handgun. And the court there struck down, restrained the police chief from engaging in that behavior, holding that such an approach contravenes the essential nature of the constitutional guarantee, which is essentially, of course, what this panel here did earlier in the case. Also, of course, Mosby v. Devine, much more recently the Supreme Court of Rhode Island, said that the constitutional right to bear arms would be illusory, their words, if the ability to carry a gun were committed to the unfettered discretion of the licensing officer. Finally, Your Honors, counsel states that we did not provide any evidence challenging the wisdom of this carry policy. That's not our burden. Even under intermediate scrutiny, it's the government's burden to prove that its law actually advances some kind of an important interest in a way that fits properly to that objective. So at that point, all I do is evaluate what the defendants have suggested as evidence, and if it meets the appropriate level of defining the government interest and fitting the regulation to that government interest, then you lose? We wouldn't lose because, number one, they didn't have any evidence, but number two- Well, they had the affidavit, as you suggested. But the affidavit didn't show that this policy was necessary to address some feature of carrying handguns. What the affidavit basically stated, the theory of the case was carrying handguns is dangerous and we want to reduce or eliminate that danger. Even if we were to concede that they're correct, for the sake of argument, we'll tell them it's very dangerous to carry handguns, all kinds of terrible things may happen, we would still prevail because, right or wrong, that judgment has been made in the Constitution that people ratify that into the Second Amendment, and that policy choice has to be respected. Thank you, counsel. Thank you all for your arguments and your briefing. It was very helpful to the court, and we'll be in recess.
judges: Thomas, Pregerson, Silverman, Graber, McKeown, Fletcher, Paez, Callahan, Bea, Smith, Owens